**BAINS LLC d/b/a Flying B, Plaintiff,**

v.

**ARCO PRODUCTS COMPANY, Defendant.**

No. C01–235Z.

United States District Court,
W.D. Washington
at Seattle.

Aug. 28, 2002.

Erik J. Heipt, Budge & Heipt, PLLC, Seattle, WA, for Plaintiff.

Patricia Kay Buchanan, Lee, Smart, Cook, Martin & Patterson PS, Inc., Seattle, WA, Michael Reiss, Holly M. Hearn, Sara S. Bowen, Davis, Wright, Tremaine, LLP, Seattle, WA, Nancy Doyle, ARCO Products, Inc., Long Beach, CA, for Defendant.

## ORDER

ZILLY, District Judge.

This matter comes before the Court on Defendant's Motion for Judgment as a Matter of Law or for a New Trial; or in the Alternative, Motion to Set Aside Punitive Damages; or in the Alternative Remittitur of Punitive Damages, docket no. 138. The Court finds this motion appropriate for resolution without oral argument. Having considered all relevant pleadings, the Court DENIES Defendant's Motion.

## BACKGROUND

Plaintiff Bains LLC is a corporation owned by three East Indian Sikh brothers. Plaintiff entered into a written contract with Defendant ARCO to haul fuel between Defendant's Cherry Point refinery in Blaine, WA to Defendant's Harbor Is-

land facilities in Seattle, WA. While loading their trucks at the Cherry Point facility, Plaintiff's owners and employees were subjected to severe discriminatory treatment on a daily basis. Plaintiff's owners and employees were consistently referred to by derogatory racial epithets, were made to use slower pumps than other drivers, made to wait longer to fill their trucks, subjected to higher security measures, and generally treated differently than non-Indian drivers. Plaintiff's owners made repeated complaints to Defendant's management and repeatedly asked Defendant's management to intervene on their behalf with the Cherry Point personnel. No investigation of the complaints was ever made and no disciplinary action was ever taken against any of Defendant's employees. Eventually, without notice, Defendant terminated Plaintiff's contract.

Plaintiff alleged that it had been subject to racial discrimination while performing under the contract and that the contract had been terminated in violation of 42 U.S.C. § 1981. Plaintiff brought claims under § 1981 and for breach of contract under state law. After a five day jury trial, the jury found for Plaintiff on all counts and awarded $1.00 in nominal damages on the § 1981 claim, $5,000,000.00 in punitive damages on the § 1981 claim, and $50,000.00 on the breach of contract claim. Defendant now moves the Court for relief from the jury's verdict.

### DISCUSSION

Defendant ARCO makes four alternative arguments in its alternative motions for judgment as a matter of law, for a new trial, to set aside the punitive damages award, or for remittitur in regard to the § 1981 jury verdict.[1] ARCO argues that: (1) there was insufficient evidence to support the jury's finding of discrimination; (2) the Court gave erroneous jury instruc-

tions; (3) there was insufficient evidence in the record to support an award of punitive damages; and (4) the $5,000,000 punitive award violates due process.

### A. Sufficiency of the Evidence, Jury Instructions, Support for Punitive Damages

■■■ When reviewing a motion for judgment as a matter of law the Court is required to make every inference in light of the non-moving party and may only enter judgment as a matter of law when the evidence "permits only one reasonable conclusion, which is contrary to the jury's verdict." *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1196 (9th Cir.2002). The Court concludes that there was sufficient evidence for the jury to conclude that Plaintiff had been discriminated against by ARCO in violation of § 1981. The jury heard extensive testimony regarding discriminatory conduct by ARCO employee Bill Davis. The jury heard further testimony regarding the conduct by ARCO managerial employee Al Lawrence and his failure to investigate or respond in any way to the concerns of Plaintiff. Finally, the jury heard evidence of the shifting explanations given by ARCO for the termination of the contract. This evidence easily supports the jury's verdict in favor of Plaintiff on the § 1981 claim.

■■■ ARCO also objects to the formation of three jury instructions and to the lack of a good faith defense instruction. The first instruction ARCO objects to is instruction 15 explaining the mixed-motive defense. Specifically, ARCO objects to the last sentence of the instruction which states "[t]his defense does not apply to any other forms of adverse treatment in the contractual relationship." ARCO excepted to this aspect of the instruction at trial. *See* Trial

---

1. ARCO does not challenge the jury's verdict on the state law breach of contract claim.

Transcript at 3, Ex. 1 to Budge decl., docket no. 164. This sentence properly limited the mixed-motive defense to the issue of whether the termination of the contract was the result of discrimination. Plaintiff's claims of other adverse treatment, namely a hostile environment, would not be subject to a mixed-motive defense because there was no, and could be no evidence, that the racial remarks and disparate treatment were the result of a legitimate motive. *Costa v. Desert Palace, Inc.*, 299 F.3d 838, 856 (9th Cir.2002) (en banc).

■ ARCO next objects to the definition of adverse action as stated in Instruction 14. The instruction stated that adverse action included "subjecting Flying B or its owners and/or employees to unwelcome and pervasive harassment on the basis of race, which adversely affects Flying B as a company." ARCO contends that this instruction erroneously allowed the jury to find for the plaintiff based on damage to a non-party. In effect, ARCO is arguing that § 1981 does not encompass a claim of hostile work environment. However, the only case on point, *Danco Inc. v. Wal–Mart Stores, Inc.*, 178 F.3d 8 (1st Cir.1999) concluded that § 1981 would include a claim for hostile work environment so long as the Plaintiff could demonstrate that the company and not just the individual employees were damaged by the conduct. *Id.* at 13–14. When Congress amended § 1981 it intended § 1981 to encompass the same rights as Title VII which would include a cause of action for a hostile work environment. Accordingly, the Court's instruction properly defined adverse action as including a hostile environment which adversely affected the corporation. Moreover, the jury was specifically instructed that damages could only be awarded to the corporation and could not be awarded to compensate the individual owners or employees for any emotional distress. *See* Instruction 22.

■ ARCO argues that the Court erred in not giving the jury a good faith affirmative defense to punitive damages instruction. ARCO relies upon *Costa*, decided after trial for its argument that the failure to give this instruction entitles it to a new trial. ARCO also argues in the alternative that Instruction 10 did not properly instruct the jury on corporate liability arising out of the acts of employees. Defendant's arguments fail for several reasons. First, ARCO never requested a good faith instruction and never objected to the lack of a good faith instruction. ARCO's only objection to the punitive damages instruction was the Court's decision to give the instruction at all. *See* Trial Transcript at 4, Ex. 1 to Budge decl., docket no. 164; Joint Statement of Disputed Instructions at 23–24, Ex. 2 to Budge decl., docket no. 164. Similarly, ARCO requested the Court give a form of Instruction 10 and did not object to the final formation of the instruction given by the Court. *See* Trial Transcript at 3–10, Ex. 1 to Budge decl., docket no. 164; Defendant's Proposed Instruction No. 9, Ex. 2 to Budge decl. at 5, docket no. 164. By failing to raise these issues at trial, ARCO has waived any objection. *Costa* at 864 (finding that failure to request a good faith instruction was not waived because the Supreme Court's opinion in *Kolstad v. American Dental Assoc.*, 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) had not been issued at the time of the trial). This case was tried well after *Kolstad* and Defendant failed to make any request for a good faith instruction in light of *Kolstad* or request alternate language in Instruction 10 in light of *Kolstad*. More importantly, the punitive damages instruction given by the Court in the present case, in contrast to the instruction in the *Costa* case, incorporated the language of *Kolstad* requiring a finding by the jury of "malicious" conduct or conduct in reckless disregard to

plaintiff's rights under federal law. *See* Instruction 21. The Court concludes that unlike "egregious conduct," which the *Costa* court held cannot equate with a lack of good faith, malicious conduct does equate as a matter of law with a lack of good faith; therefore, a separate good faith instruction was not required.[2] *Costa* at 864.

■ ARCO argues that because the jury awarded only nominal damages for the § 1981 claim, the punitive damages award is not supported by the evidence. ARCO's argument requires the court to assume the jury determined that ARCO terminated Plaintiff's contract for other lawful reasons and therefore was not liable under § 1981 for discrimination in termination of the contract. ARCO contends that there was no evidence by which the jury could have concluded that any of the alleged adverse treatment, other than termination of the contract, was attributable to any management personnel. ARCO's arguments fail for two reasons. First, making every inference in favor of the Plaintiff, the nominal damages award could have been the result of a finding by the jury that the Plaintiff's claimed damages for loss of profits was not proved with reasonable certainly as required by instruction no. 18 and not a result of a finding by the jury that ARCO would have made the same decision regardless of the discriminatory motive. The decision to terminate Flying B was made by senior management and attributable to the corporation. Second, there was evidence presented that Flying B repeatedly complained to senior management regarding the discriminatory conduct at the Cherry Point facility and that no actions were taken to investigate the claims. Further, there was testimony that manager Al Lawrence was involved in conversations during which racial epithets were used in conjunction with Plaintiff. *See* Transcript at 471–72, 477, 479. Al Lawrence was the manager of the Cherry Point facility with supervisory duties over Bill Davis. There was sufficient evidence presented for the jury to impute the continued harassment and any resulting lost profits due to the hostile work environment to ARCO management. *See Swinton v. Potomac*, 270 F.3d 794, 805, 816 (9th Cir.2001) (holding that where a harasser's supervisor receives complaints about discrimination he becomes a proxy for the corporation and his actions and inaction is attributed to the corporation).

Accordingly, the Court DENIES Defendant's Motion for Judgment as a Matter of Law or for a New Trial on the basis of sufficiency of the evidence or erroneous jury instructions.

## B. DUE PROCESS

■ ARCO's final argument is that the punitive damages award violates due process because it is grossly excessive. In reviewing a punitive damages award to determine if it is grossly excessive the Court is to consider (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the harm or potential harm suffered by the plaintiff and the award, and (3) the difference between the punitive damages awarded by the jury and civil penalties authorized or imposed in comparable cases. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

---

2. A good faith defense is available if a defendant can demonstrate that "the challenged actions were not taken by senior managers and were contrary to the employer's good faith implementation of an effective antidiscrimination policy." *Costa* at 863. The court notes that there was evidence presented that the challenged actions of terminating the contract and failing to investigate the hostile work environment were taken by senior management. Further, Defendant did not present evidence of the implementation of an effective antidiscrimination policy.

Making all inferences in favor of the non-moving party, the court finds that the $5M punitive damage award does not violate due process.

### a. Degree of reprehensibility

■ The evidence presented at trial demonstrated that an ARCO employee with supervisory responsibilities over the fuel haulers was extremely antagonistic and bigoted against the East Indian owned company Flying B. The evidence demonstrated that Flying B's drivers were subjected to pervasive and continuous harassment that impacted on their ability to perform their jobs and thereby impacted on the profitability of the company. The testimony demonstrated that Flying B drivers were made to feel so uncomfortable that they openly contemplated quitting their jobs for Flying B. Bill Davis, the ARCO employee directly responsible for fuel loading operation, referred to the Flying B drivers with derogatory slang names such as "rag-heads," "f------ indians," and "towel-heads." *See e.g.,* Transcript at 136, 284–87, 323, 327. Bill Davis did not deny using these derogatory terms. *Id.* at 453, 470. He further demeaned their religious beliefs by requesting that fuel spills be cleaned up with their turbans. *Id.* at 285. Additionally, the evidence showed that the Flying B drivers were treated differently from other company drivers, were subject to harassment when entering the facility, made to wait longer to fill their trucks, forced to use slower pumps, and generally treated poorly while at the ARCO facility. *Id.* at 131–37, 142–45, 284–89, 320–26. While ARCO maintains that Bill Davis had no managerial responsibilities, the evidence demonstrated that Bill Davis had direct control over the daily fuel hauling operation and fuel carriers. *Id.* at 449–51. Moreover, immediately after the termination of the contract, Bill Davis himself crowed that he had been responsible in part for "kick[ing] those rag heads out" of the facility. *Id.* at 408, 483.

In addition to the evidence presented regarding the conduct of Bill Davis, the jury heard testimony about Flying B's multiple appeals to Al Lawrence, the ARCO terminal manager, to intercede with Bill Davis on their behalf. *Id.* at 138–39, 142, 147, 326–31, 553–54. The evidence showed that despite these multiple complaints, no investigation took place, no disciplinary action was taken against Bill Davis, and nothing was ever noted in Bill Davis' employment file. *Id.* at 479–80. There was additional evidence that Al Lawrence in fact participated in conversations wherein the Flying B drivers were referred to as "rag-heads." *Id.* at 472. The testimony at trial showed that Al Lawrence was aware of the discriminatory and harassing conduct of ARCO employees, that he took no action to attempt to ameliorate the situation, and that he told Flying B that if their drivers were uncomfortable with their treatment, he'd have to let the company go. *Id.* at 329. Finally, the evidence showed that after the termination, although there were further complaints to more senior ARCO management regarding the disparate treatment and the allegations of discrimination in the termination of their contract, there was no investigation into Flying B's allegations. *Id.* 338–39.

There was substantial evidence for the jury to find ARCO's conduct to be egregious and malicious based upon the highly offensive language used by ARCO employees and a failure to investigate the conduct thereby fully supporting the jury's $5M award. *Swinton,* 270 F.3d 794 (9th Cir. 2001); *In re Exxon Valdez,* 270 F.3d 1215, 1242–43 (9th Cir.2001) (failing to mitigate harm denotes a higher degree of reprehensibility). The degree of reprehensibility in this case fully justified the amount of puni-

tive damages awarded here for at least two reasons. First, there was direct evidence that Defendant's decision to terminate the contract was intentional and based on the race and national origin of Plaintiff's owners. *See* Transcript at 408 (Testimony that Davis took responsibility for "kick[ing] those rag heads out" of the facility by terminating Plaintiff's contract). Thus, in contrast to the $2 million punitive damages in the *BMW* case based upon "purely economic" damages, the damages here are based on the malicious conduct of Defendant in acting with reckless indifference to Plaintiff's federally protected rights. Second, the degree of reprehensibility in this case is demonstrated by the complete lack of remediation or mitigation of damages. In contrast to the millions of dollars Exxon had spent to compensate many people after the oil spill "thereby mitigating the harm to them and the reprehensibility of this conduct," 270 F.3d at 1242, ARCO took no action to investigate the claim of racial harassment and never implemented any procedures to improve the conditions at the Cherry Point facility. Accordingly, the Court finds that the punitive damages award is in-line with the reprehensibility of ARCO's outrageous conduct.

### b. Disparity Between Harm Caused and Size of Award

 The jury awarded $1.00 in nominal damages to Plaintiff on its § 1981 claim. ARCO argues that the $5M punitive damages award is not, therefore, reasonably related to the actual damages suffered. Comparison of compensatory damages to punitive damages is not, however, a rigid test. This is especially true in civil rights cases where damages may be difficult to compute and may not reflect the magnitude of the injury inflicted upon the Plaintiff. Therefore, an award of punitive damages is appropriate even where economic damages are not calculable and only nominal damages are awardable. *BMW,* 517 U.S. at 582, 116 S.Ct. 1589 (higher ratios may be justified where it is difficult to calculate the value of the harm); *Passantino v. Johnson & Johnson Consumer Products, Inc.,* 212 F.3d 493, 514 (9th Cir.2000) (punitive damages may be awarded in the absence of compensatory damages); *Swinton,* 270 F.3d at 819 ("The fact that the harm from unchecked racial harassment occurring day after day cannot be calculated with any precision does not deflate its magnitude."); *Lee v. Edwards,* 101 F.3d 805, 811 (2nd Cir.1996) ("Violations of civil rights may very well be 'particularly egregious' acts that result in ... injuries whose monetary value is 'difficult to determine' ").

 Further, the Court is to consider potential damages caused by a defendant's conduct in addition to actual damages found by the jury. *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). In this case, the testimony demonstrated that Plaintiff suffered economic injury through the harassing and disparate treatment of its drivers. Plaintiff's expert witness on damages testified that the company lost approximately $550,000 as a result of the Defendant's termination of the contract. Although there was substantial evidence of direct economic loss by the owners of the business, the jury did not find damages were proved with the reasonable certainty required by the Court's instructions. Additionally, the testimony demonstrated that although multiple appeals to ARCO management had been made, the discriminatory treatment was continuing and the Flying B drivers were contemplating quitting. *See* Transcript at 328–29. Thus, whether or not the jury found that the discriminatory conduct was the sole cause of the termination, the testimony made it

clear that ARCO's conduct had the potential to cause Flying B up to $550,000 in economic damages due to loss of business.

Moveover, there was strong evidence of other substantial potential harm to Plaintiff due to Defendant's conduct.[3] Although Plaintiff was not able to provide the jury with convincing evidence of their anticipated loss of this economic damage, as demonstrated by the award of nominal damages, there was sufficient evidence for the jury to conclude that Plaintiff was substantially damaged by the hostile work environment. The jury was specifically instructed that it could not award the company damages for the emotional distress of its drivers unless it concluded that the company itself had suffered economic injury and that while Plaintiff was not attempting to claim compensatory damages for this injury, it could be taken into account in measuring punitive damages. *See* Jury Instructions 14, 22; Transcript at 141, 146–47. The jury's award of nominal damages and high punitive damages is reflective of its findings that while compensatory damages were difficult to calculate, the egregiousness of Defendant's conduct was obvious to everyone in the courtroom.

 The Court is also to consider whether the conduct at issue had the potential to harm other victims and accordingly whether the award was meant to deter possible harm to these other victims. *TXO*, 509 U.S. at 460, 113 S.Ct. 2711. Plaintiff presented evidence that ARCO took no action in response to repeated complaints of significant and pervasive racial discrimination by its employees and supervisors. The complete lack of investigation or responsiveness to the complaints alleged by Plaintiff demonstrates that this type of behavior is tolerated by ARCO. ARCO took no action even after its employee admitted in his deposition and at trial that he used racially derogatory language towards the Flying B drivers. There is substantial concern regarding "possible harm to other victims" where a company does not investigate or reprimand harassing employees. *TXO*, 509 U.S. at 460, 113 S.Ct. 2711. One important purpose of anti-discrimination legislation is the prevention of future similar conduct by the same of other harassers. *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir.1991) (discussing employer's duty to take prompt corrective action that has potential to prevent actions by future harassers); *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir.2001) (same).[4] ARCO took no corrective actions in this case and the punitive damages award is reasonably related to the potential of harm to future victims.

Finally, the defendant's wealth is a relevant factor in assessing the ratio element

---

**3.** There was evidence presented that when the contract was entered into in March, 2000, Plaintiff had only one truck available for hauling fuel. After the contract was entered into, in July and August, 2000 Plaintiff purchased three additional trucks and hired additional employees. In addition, immediately prior to termination, the Plaintiff purchased two more trucks and made arrangements to purchase an additional two trucks to bring its fleet to eight. Plaintiff had the expectation that during the remaining eight months the Olympic Pipeline was scheduled to be shut down, Plaintiff would operate a total of eight trucks each of which would generate approximately $10,000/month in prospective profit to the company as they were phased into service.

**4.** In addition, an evaluation of "grossly excessive" requires a comparison to the goals of punishment and *deterrence*. *BMW*, 517 U.S. at 568, 116 S.Ct. 1589 (emphasis added). The ratio guidepost is meant in part to prevent overdeterrence. *In re Exxon Valdez*, 270 F.3d at 1244. In this case, the $5M award does not present concerns regarding overdeterrence as it equates to approximately one-half of one day's net profit or less than .0017 of one year's net income of the Defendant.

of the *BMW* test. *Swinton,* 270 F.3d at 818–19. In this case, the jury was cautioned by Plaintiff's counsel to be reasonable in awarding punitive damages. The jury was presented with evidence that the damages it chose to award amounted to half of one day's net profits or less than .0017 of one year's net profits. The size of the award is not excessive in view of Defendant's financial picture. *Id.*

### c. Comparable Penalties

■ ARCO's final argument is that the punitive damages award is not consistent with other potential penalties that could be levied against the defendant or that have been awarded in similar cases. ARCO first argues that "the only legislative sanctioned "penalty" that comes close to that of section 1981" is the Title VII cap of $300,000 and thus that amount should be used as a marker by this Court. ARCO fails, however, to acknowledge that while Congress explicitly acted to set limits on awards under Title VII, it chose not to do so under the comparable § 1981 statute. This strongly suggests that Congress envisioned that larger awards were appropriate under § 1981 and that the statutory cap was not controlling. Although the Title VII damages cap does not apply in a § 1981 case, the Supreme Court has cautioned courts to refer to such analogous sanction in determining the constitutionality of a punitive damage award. *Swinton,* 270 F.3d at 794 (citing *BMW,* 517 U.S. at 583–585, 116 S.Ct. 1589). Thus, while it is not appropriate to institute a *de facto* judicial cap on punitive damages in § 1981 suits by finding that the awards must be comparable to the Title VII capped awards, *Hampton v. Dillard Dept. Stores,* 247 F.3d 1091, 1117 (10th Cir.2001); *Mercer v. Duke University,* 181 F.Supp.2d 525, 552 (M.D.N.C.2001), the Court must take the Title VII cap into account. Accordingly, while the Title VII cap does weigh in favor of a reduction of the award, in light of Congress' determination not to cap § 1981 awards, the Court does not find this issue dispositive. *See Swinton,* 270 F.3d at 820.

■ There are no other analogous "civil penalties" for the conduct alleged in this action. *Swinton,* 270 F.3d at 820. Plaintiff and ARCO have provided appendices reflecting punitive damages awards in other cases involving discrimination, each arguing that these awards support their arguments regarding the punitive damages award. *See* Ex. C to Budge decl., docket no. 153; Ex. 1 to Defendant's Motion, docket no. 138. The Court finds these charts to be of very limited help as amply demonstrated by the wide variance between the charts and the limited information contained therein. Punitive damages awards are based on a multiplicity of factors unique to each case and to each defendant. *TXO,* 509 U.S. at 457–58, 113 S.Ct. 2711. A blanket comparison to other cases without a consideration of the facts relevant to each award would be in direct violation of the Supreme Court's warning that evaluation of awards under the due process clause is not a mathematical nicety. *BMW,* 517 U.S. at 582, 116 S.Ct. 1589.

■ Under all the facts of this case, the Court concludes that the $5M punitive damages award was not so grossly excessive so as to offend the principles of due process. The nature and extent of the racial harassment and racial slurs was strong evidence that the contract was terminated because of the race and national origin of Plaintiff's East Indian Sikh owners. Defendant's failure to take any action to stop the egregious conduct also provides strong evidence of racial animus. A review of the record leaves the Court firmly convinced that the amount of the punitive damage award in this case was fully justified by the evidence and, in the Court's view, does not "jar one's constitutional sen-

sibilities." *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Accordingly, the Court DENIES Defendant's Motion for a New Trial or in the alternative for Remittitur on the basis of the punitive damages award.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendant's Motion for Judgment as a Matter of Law or for New Trial; or in the alternative, to Set Aside Punitive Damages; or in the Alternative Remittitur of Punitive Damages, docket no. 138.

IT IS SO ORDERED.