**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BAINS LLC, dba Flying B,
      *Plaintiff-Appellee,*

v.

ARCO PRODUCTS COMPANY, a
division of Atlantic Richfield Co.,
      *Defendant-Appellant.*

No. 02-35906

D.C. No.
CV-01-00235-TSZ

BAINS LLC, dba Flying B,
      *Plaintiff-Appellee,*

v.

ARCO PRODUCTS COMPANY, a
division of Atlantic Richfield Co.,
      *Defendant-Appellant.*

No. 02-35993

D.C. No.
CV-01-00235-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
December 4, 2003—Seattle, Washington

Filed April 19, 2005

Before: Andrew J. Kleinfeld, Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Kleinfeld

4361

## COUNSEL

Scott W. Fowkes (argued and briefed) and Richard C. Godfrey (briefed), Kirkland & Ellis, Chicago, Illinois, and Michael Reiss (briefed) and Paula Lehmann (briefed), Davis Wright Tremaine LLP, Seattle, Washington, for the appellant.

Erik J. Heipt (argued and briefed) and Edwin S. Budge (briefed), Budge & Heipt, PLLC, Seattle, Washington, for the appellee.

## OPINION

KLEINFELD, Circuit Judge:

This is a punitive damages case involving nominal compensatory damages brought by a corporation for racial discrimination.

### Facts

This case went to trial before a jury, so we state the facts and interpret the evidence most favorably to the party that was successful at trial.[1]

The facts are well laid out in the published decision of the district court.[2] In 1999 an Olympic Pipeline Company petroleum pipeline ruptured, interfering with the transportation of

---

[1]*See In re Exxon Valdez*, 270 F.3d 1215, 1221 (9th Cir. 2001).

[2]*Bains LLC v. ARCO Prods. Co.*, 220 F. Supp. 2d 1193 (W.D. Wash. 2002).

fuel from refineries in Northwest Washington to a distribution center in Seattle. It took two years to fix the pipeline. During that period ARCO hired a number of companies to truck fuel from its Blaine, Washington refinery to the distribution center.

Paul, Gary, and Deep Bains are American citizens who were born in the Punjab region of India. The Bains brothers bought a gas station and convenience store in Okanogan, Washington. They were the first Sikh family in the area. They did business under the name "Flying B," signifying that the Bains brothers were flying high in the American business world. Flying B soon owned five gas stations and employed thirty people. The brothers bought a tanker truck for about $100,000 and got the necessary permits to haul gasoline to their stations. That investment put the Bains brothers in an excellent position to make some money when the Olympic pipeline ruptured and ARCO needed help. In March 2000 they signed a contract with ARCO to haul fuel. By then Flying B was doing business as a corporation, the stock of which was owned solely by the three Bains brothers.

In June 2000, Flying B started hauling fuel for ARCO, and in August, after getting the necessary permits and safety clearances from ARCO, the company bought three more trucks and hired more drivers, although the Bains brothers themselves continued to drive trucks as well. But after four and a half months, about 600 loads (or 6.5 million gallons of gasoline), and 130,000 miles, Flying B's work ended on October 30, 2000, when ARCO terminated it.

During the period that Flying B transported fuel for ARCO, the Bains brothers and their drivers had to endure a considerable measure of abuse from Bill Davis, the lead man at ARCO's Seattle terminal where the drivers dropped off their fuel. Davis did not like the Flying B drivers and purposely made their unloading work at the Seattle terminal difficult. He made a point of delaying the Flying B drivers by ignoring

their presence when they needed their papers signed after a delivery. Because ARCO paid by the load (about $460 for each load), the delays meant that Flying B's drivers could haul fewer loads and make less money. Davis made them stand out in the rain while other drivers were allowed to stay in their trucks or seek shelter. Davis also falsely accused Flying B drivers of various safety violations and made them clean up spills left by other drivers instead of making those responsible clean up their own spills.

Davis's rudeness included — and by inference arose from — his ethnic animus against Sikhs. Paul and Deep Bains, and many of the other Flying B drivers, were religiously observant Sikhs who wore turbans and long beards. Davis started his relationship with Paul Bains by refusing to shake his hand. He called Paul a "diaperhead" to his face despite Paul's protest that his turban was an important religious symbol. "Mr. Bains" or "Paul" were apparently too hard for Davis to say — he preferred "raghead." One of Flying B's hired drivers said Davis commonly called him "stupid Indian," "motherfucking Indian," and similar sobriquets, and when he asked for a rag after Davis had told him to clean up a spill, Davis refused and told him to take the "fucking rag from your head and clean it."

After months of Davis's abuse, the morale of Flying B drivers suffered and drivers threatened to quit. Even the non-Sikh Flying B drivers felt degraded by Davis's attitude toward their association with their company. Davis asked both Patrick Dauer and A. C. Morgan, the only two Caucasian Flying B drivers, "How did you get hooked up with these fuckers?"

Eventually the Bains brothers decided to report Davis's abuse to Al Lawrence, the manager of the Seattle terminal and Davis's boss. The brothers decided that Deep would talk to Lawrence. Deep told Lawrence all about Davis's behavior, such as the names that Davis had called them — "diaperhead," "stupid fucking Indian," "raghead," and "towelhead"

— as well as how Davis had told them to go back to India, and how he made the Flying B drivers use slower pumps and stand outside in the rain. Deep told Lawrence that the Flying B drivers were threatening to quit because of the hostile atmosphere. Lawrence responded that perhaps Davis was upset about something and asked Deep to let him know if anything happened in the future.

But the problems continued and Davis kept up his abuse. The Flying B drivers were subjected to lengthy security checks when other drivers were not. Deep complained to Lawrence again, but it did not do any good. Davis continued his ethnic abuse, and the security delays reserved exclusively for Flying B drivers continued. Gary Bains went to Lawrence and advised him yet again of the continuing abuse. But instead of stopping Davis's abuse, Lawrence and ARCO stopped Flying B. ARCO terminated Flying B without giving a reason and without notice, not even the thirty-day minimum notice required by their contract. Flying B was forced to lay off a number of employees and to sell their now superfluous trucks. Deep Bains contacted Tim Reichert, the Los Angeles central dispatch manager, who was above Lawrence in the ARCO hierarchy, to contest the termination, but to no effect. Reichert claimed that there were too many trucks for the job. After this litigation had begun, ARCO claimed that Flying B had committed various safety violations, including driving unsafe trucks, drivers smoking or using cell phones while delivering fuel, and drivers failing to clean up spills.

An important part of the case was whether the ethnic nastiness and coarse language was only Davis's independent foray into obnoxiousness, or whether ARCO, through Davis's supervisor, Al Lawrence, ought to have known about Davis's behavior and done something about it. The parties also disputed whether ARCO's termination of Flying B had anything to do with the racism. In addition to the Bains' testimony that they had complained to Lawrence, a driver for another company, Torrance Holmes, testified that once he started chatting

with the Bains brothers, Lawrence quit talking to him. Holmes also testified that he heard Davis brag that "we kicked those ragheads out of here and they're never coming back."

In his own testimony, Bill Davis admitted that he had used the term "raghead" "once in a while" when referring to the Bains brothers in conversations with coworkers, typically when other people complained about Flying B drivers. Davis had admitted during discovery that he had used the term "raghead" with his boss Al Lawrence, but later clarified that this was when Lawrence had asked him whether he had called the Flying B drivers "ragheads," and Davis responded that he had not. Thus, the gist of Davis's testimony was that he called the Flying B drivers "ragheads" only behind their backs, not to their faces. Lawrence never disciplined or reprimanded Davis, but Davis claimed that he quit using the term after his chat with Lawrence. Davis said he knew about ARCO's policy that prohibited racial discrimination and discriminatory language. Of course the jury may have disbelieved any or all of ARCO's exonerating testimony.

An economist testified that Flying B suffered a $576,000 loss on account of the termination. He calculated this based solely on the profits the company would have made from November 1, 2000, when Flying B was terminated, to June 30, 2001, when the pipeline was fixed and ARCO no longer needed drivers to move the fuel.

Tim Reichert, the manager above Lawrence who had the authority to terminate Flying B and did so, testified that he knew nothing about the ethnicity of Flying B's owners or drivers. Reichert said that his motivations for terminating the contract were Al Lawrence's assertions that Flying B had a large number of safety violations, and his own concern that there were too many carriers transporting fuel to the terminal.

Al Lawrence testified that Bill Davis had advised him of numerous infractions by Flying B, such as not using buckets

to catch spills, leaving valves open, using cell phones while pumping, and lining up trucks improperly so as to inconvenience other drivers. Almost all the complaints he heard about involved Flying B, even though they were the smallest carrier ARCO used. Lawrence said that he suspended Flying B exclusively because of safety violations, and that race was never a factor. But Lawrence conceded he had not documented any of these safety concerns when they occurred. Lawrence had final authority over safety issues at the Seattle terminal and made the decision to lock Flying B out of the terminal facility, while Tim Reichert had final authority and made the decision to terminate the contract.

The jury delivered a special verdict. It found that ARCO had breached Flying B's contract, a state law claim, and awarded $50,000 in compensatory damages for the breach. The verdict also established that ARCO had discriminated against Flying B on account of race, in violation of 42 U.S.C. § 1981, but that the actual damages to the corporation on account of this discrimination were nominal. The jury therefore awarded only one dollar in compensatory damages on the § 1981 claim. In addition, however, the jury awarded five million dollars in punitive damages for the racial discrimination. ARCO moved for judgment as a matter of law or a new trial, or alternatively, to set aside or remit the punitive damages. The district court denied the motions. The district court awarded $392,065 in attorneys' fees and $10,017.40 in costs, plus $50,000 in additional fees and $916.36 in additional costs, based on the post-trial proceedings. ARCO appeals.

## Analysis

### I. Judgment as a Matter of Law or New Trial on § 1981

ARCO argues that it was entitled to judgment as a matter of law, or alternatively, a new trial, because a corporation cannot suffer racial discrimination actionable under 42 U.S.C.

§ 1981,[3] and because even if that is incorrect, the award of only nominal damages establishes that firing Flying B was not motivated by race discrimination.

## A.   Corporate Plaintiff

ARCO argues that it is entitled to judgment as a matter of law because, to establish a § 1981 claim, a plaintiff must establish that it is a member of a racial group, and Flying B cannot meet this requirement because a corporation "has no racial identity."[4] We review a denial of a renewed motion for judgment as a matter of law de novo.[5]

[1] Contrary to ARCO's interpretation of § 1981, our decisions hold that a corporation has standing to bring a § 1981 claim against a defendant that employs the corporation as a contractor, but imposes ethnic discrimination against the corporation's employees. In *Parks School of Business, Inc. v. Symington*[6] we held that a school, which was organized as a

---

[3]42 U.S.C. § 1981(a)-(b) states:

(a)   Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b)   "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

[4]*See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977).

[5]*White v. Ford Motor Co.*, 312 F.3d 998, 1010 (9th Cir. 2002).

[6]*Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1488 (9th Cir. 1995); *cf. Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 707-08 (9th Cir. 1997) (holding that a corporation, even if it had no ethnic identity, had standing to bring an antidiscrimination claim if compelled to discriminate by race or sex when it hired subcontractors).

corporation and mostly enrolled minority students, had standing to bring a § 1981 claim because racial discrimination against its students would damage the corporation's business by interfering with its right to contract with minority students. We went even further in *Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc.*,[7] where Thinket, a corporation owned entirely by African Americans, alleged that Sun Microsystems had deliberately refused to contract with Thinket based solely on its status as an African-American business.[8] We found that when a corporation has acquired an "imputed" racial identity, it can be the direct target of discrimination and has standing to pursue a claim under § 1981.[9] Here, as in *Thinket*, the corporation is owned entirely by Sikh shareholders, and while not all of its drivers were Sikhs, even the non-Sikh drivers testified that they were treated poorly by Davis based on their association with what Davis saw as a Sikh company. Flying B undoubtedly acquired an imputed racial identity, and its allegation that its contract with ARCO was terminated due to the effects of racial discrimination clearly gives it standing to pursue a § 1981 claim against ARCO.

## B.   Economic Injury

ARCO argues that the jury verdict — awarding one dollar in nominal damages for the § 1981 violation — establishes that the ethnic discrimination caused no economic harm (as opposed to the breach of contract, for which $50,000 was awarded), and that there can be no injury to a corporation without economic damages. ARCO moved for a new trial, which the district court denied. We review the district court's denial of a motion for a new trial for abuse of discretion.[10]

---

[7]*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053 (9th Cir. 2004).

[8]*See id.* at 1056.

[9]*Id.* at 1059.

[10]*See McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1032 (9th Cir. 2003).

Because we are reviewing a case that resulted in a jury verdict, we interpret the evidence, and state our account, most favorably to the parties successful at trial.[11]

First, the district court instructed the jury that, because the plaintiff was a corporation, the jury could award damages, even nominal damages, only for harm to the corporation, not for the emotional distress to its owners or employees. We must presume that the jury followed that instruction.[12]

[2] Second, the one dollar in nominal damages for the § 1981 violation was not the whole of the jury's verdict. The jury also found that ARCO had in fact discriminated against Flying B because of race, that it caused a $50,000 loss by breaking its contract with Flying B, and that ARCO deserved to be punished for its racial discrimination to the extent of $5 million. These verdicts could be viewed as inconsistent, but, as we held in *White v. Ford Motor Co.*, a court has a duty under the Seventh Amendment to harmonize a jury's seemingly inconsistent answers if a fair reading allows for it.[13] The district court was therefore obligated to ask "not whether the verdict necessarily makes sense under any reading, but whether it can be read in light of the evidence to make sense."[14]

[3] We agree with the district court that the verdict is not inconsistent and does not establish the absence of economic harm. The district court correctly held that the jury may have found that Flying B's claimed damages for lost profits were not "shown with reasonable certainty" as required by jury instruction number 18. On the evidence in this record, the jury could well have concluded that (1) racial discrimination had

---

[11]*In re Exxon Valdez*, 270 F.3d at 1221.

[12]*See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Martinez v. Garcia*, 379 F.3d 1034, 1035 (9th Cir. 2004); *Ho v. Carey*, 332 F.3d 587, 594 (9th Cir. 2003).

[13]*See White*, 312 F.3d at 1005.

[14]*Id.*

caused lost profits by delaying Flying B's drivers and thereby reducing the number of loads Flying B hauled; but (2) the jury did not have testimony that would enable it to put a number on how many loads were lost; so (3) even though lost profits were proved, the "amount" of lost profits could not be established "with reasonable certainty," as the jury instruction required.

**[4]** The damages to Flying B, as a predicate for punitive damages, do not have to be from the termination. Section 1981 extends its prohibition against racial discrimination in the making and enforcement of contracts to cover all phases and incidents of the contractual relationship, not just the termination of a contract.[15] The testimony established that ARCO employees made Flying B's drivers wait longer to fill their trucks and to use slower pumps than other drivers, and that Flying B drivers suffered damaged morale. The jury could have concluded that Flying B suffered economic harm during the contractual relationship from the intentional delays and its drivers' damaged morale, which resulted in a reduced number of loads — and therefore less money under a contract that paid by the load — and that all of this was caused by Davis's racial harassment. Flying B's economics expert testified that Flying B would have made $576,000 if it had continued to haul the same number of loads it did until the broken pipeline was fixed, but he did not offer testimony on how much money Flying B lost because of the slowdowns caused by Davis's racial harassment. The jury could reasonably have concluded that Flying B had made less money while it was hauling because of Davis's racial harassment, yet reasonably have found no number that it could attach to the harm, and therefore awarded nominal damages.

Flying B was terminated by a manager who did not know that the company's principals and most of its drivers were

---

[15]*See* 42 U.S.C. § 1981(b); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994).

Sikhs, so the jury could have found that the breach of contract damages compensated for the harm from the contract's termination. But the jury could have concluded from the evidence that, had Reichert not terminated Flying B for safety violations, Davis and Lawrence would have found a way to terminate Flying B anyway. The jury could have found that routine or debatable safety violations were flagged for Reichert because of Davis's racial animus, whereas the same violations committed by a non-Sikh company would be ignored. Possibly the jury found that under the contract Flying B was entitled to thirty-days notice, that ARCO's immediate termination of the contract without notice cost Flying B around $50,000 in damages, and that putting the same $50,000 under both the § 1981 and the breach of contract causes of action would be double counting. The jury might therefore have put the damages under the breach of contract claim, but signified its agreement with Flying B on the § 1981 claim with its affirmative verdict on that claim.

[5] The district court, having heard all the evidence, was able to reconcile the verdicts, and on our review of the evidence and arguments, we find no irreconcilable conflict.[16]

## C.  Pure Motive

ARCO argues that because Tim Reichert terminated Flying B for reasons that the verdict establishes were nondiscriminatory, there can be no § 1981 liability. That argument necessarily fails for the reasons explained above. Even if Reichert terminated Flying B for non-racial reasons, that does not mean that ARCO, through Davis and Lawrence, did not nonetheless cause economic harm to Flying B for racial reasons.

ARCO also makes a "mixed motive" argument, that if it can be shown that ARCO would have done what it did without the racial animus, then there can be no § 1981 remedy.

---

[16]*See White*, 312 F.3d at 1006.

We need not resolve this argument because the jury verdict establishes that ARCO did harm Flying B for racial reasons by mistreating and delaying its drivers, and that ARCO deserved to be punished for it, regardless of whether the termination of the contract was for the safety reasons urged by ARCO. The verdict does not establish that ARCO would have terminated Flying B had there been no racial animus.

An award of nominal damages does not mean that there were not actual economic damages, just that the exact amount of damages attributable to the improper conduct was not proven.[17] The court instructed the jury to award nominal damages if it found that ARCO had harmed Flying B in violation of § 1981, but that Flying B "failed to prove damages as defined in these instructions." And that is exactly what the jury did.

## D. Jury Instructions

In jury instruction number 15, the court instructed the jury that it should find in favor of ARCO if it found that ARCO had proven that it would have made the decision to terminate the contract even if the race of the Flying B's owners and employees had played no role. ARCO argues that the instruction erroneously allowed the jury to find for Flying B even if it concluded that Flying B would have been terminated without any ethnic discrimination. ARCO objects to the sentence in the instruction that states "This defense does not apply to any other forms of adverse treatment in the contractual relationship." As we explained above, however, the sentence was a correct statement of law. Even if ARCO terminated Flying B entirely for good, legitimate reasons, with no mixed motives at all, it would not have a defense to the entirety of Flying B's § 1981 claim, if, for racially discriminatory reasons, ARCO imposed delays (slow pumps, extra security checks, etc.) on Flying B that reduced the amount of profits

---

[17]See Schneider v. County of San Diego, 285 F.3d 784, 795 (9th Cir. 2002); Weinberg v. Whatcom County, 241 F.3d 746, 752 (9th Cir. 2001).

it could earn. There can, of course, be no legitimate reason for disparate treatment that imposes costly delays on account of the race of Flying B's owners and drivers. A § 1981 claim lies on behalf of a corporation that is harmed economically in the performance of its contract because of race, even if neither the hiring nor the firing of the corporation was affected by race.

## II.  Managerial Misconduct and § 1981 Liability

ARCO argues that all the racial harassment of Flying B people was done by Bill Davis, and that since Davis was not a managerial employee (ARCO portrays Davis as a mere gas station attendant), the jury cannot award punitive damages against ARCO as the corporation that employed Davis.

[6] ARCO correctly argues that it is not enough for an award of punitive damages to show that an ARCO employee acted maliciously to deprive Flying B of its constitutional rights on account of ethnicity. *Kolstad v. American Dental Association*[18] establishes, in the context of Title VII punitive damages, that an employee's conduct must be imputed to his employer to give rise to punitive damages liability.[19] Agency principles limit vicarious liability for punitive damages awards.[20] Under *Swinton v. Potomac Corp.*,[21] an employer has a good faith defense to vicarious liability for discrimination if it undertakes appropriate steps to prevent and correct discriminatory conduct by its employees. If the harasser is a supervisor, the employer may be held vicariously liable, but if the harasser is a coworker, the plaintiff must prove that the employer knew or should have known of the harassment and

---

[18]*Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999).

[19]*Id.* at 539.

[20]*Id.* at 541-44; *see Costa v. Desert Palace, Inc.*, 299 F.3d 838, 864 (9th Cir. 2002), *aff'd* 539 U.S. 90 (2003); *Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 516 (9th Cir. 2000).

[21]*Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001).

did not take adequate steps to correct it.[22] ARCO offers no reason why
*Kolstad* and *Swinton* should not be applied in the context of a corporation that discriminates on account of ethnicity against another corporation that it hires as an independent contractor, and our decision to apply this body of law to § 1981 liability in *Swinton*[23] and other cases[24] would foreclose such an argument. Agency principles limit vicarious liability in § 1981 claims as in Title VII claims.

ARCO does not challenge the instructions that the district court gave on vicarious liability, just the sufficiency of the evidence to establish it. We review ARCO's challenge to the sufficiency of evidence supporting the punitive damages award under the "substantial evidence" standard.[25] "The test is whether 'the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury.' "[26]

The district court reviewed the evidence with care, and concluded, correctly, that the jury could find that Davis was not a mere gas station attendant, but a supervisor. While ARCO claims that Davis had no managerial responsibilities, the evidence demonstrated that Davis had direct control over the daily fuel hauling operation and fuel carriers. Moreover,

---

[22]*Id.* at 803.

[23]*See id.* at 803 n.3.

[24]*See Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1412 (9th Cir. 1987) ("An employee may seek relief under both Title VII and section 1981 for racial discrimination in employment. *Lowe [v. City of Monrovia]*, 775 F.2d [998,] 1010 [(9th Cir. 1986)]. . . . The same standards apply, and facts sufficient to give rise to a Title VII claim are also sufficient for a section 1981 claim. *Id.*"); *see also Nichols v. Azteca Restaurant Enters.*, 256 F.3d 864, 875 n.9 (9th Cir. 2001).

[25]*See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 907 (9th Cir. 2002).

[26]*White*, 312 F.3d at 1010 (quoting *Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1226 (9th Cir. 2001)); *In re Exxon Valdez*, 270 F.3d at 1237.

immediately after the termination of the contract, Davis himself took credit for getting Flying B terminated, bragging to non-Flying B drivers about his part in "kick[ing] those ragheads out" of the facility.[27]

**[7]** Even were Davis not a supervisor, there can be no question under the evidence that Lawrence was. Lawrence was ARCO's official in charge of the Seattle terminal and, as Tim Reichert testified, Lawrence had full authority over safety issues at the terminal, including the power to lock Flying B out of the facility. The jury could conclude that when Flying B first complained to Lawrence about Davis's racial harassment, Lawrence simply made excuses for Davis's behavior and did nothing about it. And when Flying B repeated its complaints several times, Lawrence did nothing to restrain Davis, but instead terminated Flying B without even the thirty-days notice required by the contract.

**[8]** Davis testified that Lawrence was present on occasions when he called the Flying B drivers "ragheads." The jury did not have to conclude, as ARCO urges, that Lawrence locked out Flying B only for safety violations. The jury could conclude, to the contrary, that Lawrence perceived a conflict between Flying B and Davis — over Davis's harassment and intentional delays of those he called "ragheads" — and that Lawrence chose to back up Davis. That suffices for corporate liability. If a company official with sufficient authority to subject the company to vicarious liability backs-up a racist employee's racially-motivated conduct instead of protecting the victim from the employee, then the company is liable, even if the supervisor's motivation is non-racial, such as loyalty to his subordinate or a desire to avoid conflict within the company. A written antidiscrimination policy does not insulate a company from liability if it does not enforce the

---

[27]*Bains*, 220 F. Supp. 2d at 1199 (alteration in original).

antidiscrimination policy and, by its actions, supports discrimination.[28]

## III.   Amount of Punitive Damages

[9] ARCO argues that the $5 million in punitive damages awarded by the jury was excessive in light of *BMW of North America, Inc. v. Gore*[29] and *In re Exxon Valdez*.[30] We review the excessiveness of punitive damages de novo.[31] The guideposts we follow are: (1) the degree of reprehensibility, (2) the disparity between the harm suffered and the punitive damages award, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.[32] The gist of ARCO's argument is that the harm to Flying B was purely economic, and that the amount of punitive damages is too great relative to the amount of economic damages awarded. As to the amount of punitive damages, ARCO's argument is partially correct.

[10] *State Farm Mutual Automobile Insurance Co. v. Campbell*[33] enumerates the factors to be used when evaluating the reprehensibility of a defendant's conduct. We look to whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."[34] Here the harm to Flying B was economic and did not

---

[28]*Swinton*, 270 F.3d at 810-11.

[29]*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).

[30]*In re Exxon Valdez*, 270 F.3d 1215 (9th Cir. 2001).

[31]*Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001).

[32]*BMW*, 517 U.S. at 574-75.

[33]*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003).

[34]*Id.* at 419 (citing *BMW*, 517 U.S. at 576-77).

evince reckless disregard of health or safety. More than in *Exxon Valdez*, where we noted that the wrongdoing did not kill anyone,[35] here there was no threat of physical harm. That reduces reprehensibility. On the other hand, the conduct was not an isolated incident but repeated, the target was highly vulnerable financially, and the harm resulted from intentional malicious conduct. An Exxon oil tanker that performs a socially valuable task can accidentally run aground causing damage. By contrast there can be no excuse for intentional, repeated ethnic harassment, so the reprehensibility here is worse than conduct that might have some legitimate purpose. In *Exxon Valdez*, we held that "[r]eprehensibility should be discounted if defendants act promptly and comprehensively to ameliorate any harm they cause in order to encourage such socially beneficial behavior."[36] Here, given ARCO's clear failure to remedy or even address the discriminatory effects of its employee's conduct, the jury could properly have concluded that punitive damages were necessary to prevent such discrimination from occurring in the future.[37]

As to the other two *BMW* factors, the disparity between the harm suffered and the punitive damages award, and the difference between this remedy and civil penalties authorized or imposed in comparable cases,[38] ARCO is on stronger ground.

On the facts of this case, in determining the correct amount of punitive damages, the jury could properly consider not only the one dollar in nominal damages awarded for discrimination under § 1981, but also the $50,000 in compensatory damages awarded for breach of contract. The conduct was intertwined and the jury could conclude that, even if Tim Reichert would have terminated Flying B based on the safety reports that Al Lawrence gave him, those safety reports would never have

---

[35]*In re Exxon Valdez*, 270 F.3d at 1242-43.

[36]*Id.* at 1242.

[37]*See State Farm*, 538 U.S. at 419.

[38]*BMW*, 517 U.S. at 574-75.

come to Reichert had Lawrence not decided to back up his racist leadman or to exercise his authority to lock Flying B out of the terminal. Thus we take $50,000 as the harm suffered.

Flying B argues that because "potential harm" may properly be considered under *TXO Production Corp. v. Alliance Resources Corp.*,[39] a much higher punitive damages award is appropriate. But *TXO* was speaking of the potential harm "if the wrongful plan had succeeded, as well as the possible harm to other victims."[40] Here the wrongful conduct did succeed. It is not as though Davis had fired a shot at Flying B and missed. Davis bragged that he had "gotten rid of those ragheads." As for the harm to the individual drivers, the award to Flying B did not impair their own rights to sue for whatever common law or state statutory torts that might lie, such as intentional infliction of mental distress. Potential harm to others is best considered when victims are not in a position to vindicate the wrongs against themselves, not where, as here, they are in such a position.

**[11]** In *State Farm*, the Supreme Court held that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."[41] The rare exception might be a case where "a particularly egregious act has resulted in only a small amount of economic damages."[42] This is not a "small amount" case because the economic damages were substantial — $50,000. The controlling Supreme Court authority therefore implies a punitive damages ceiling in this case of, at most, $450,000 (nine times the compensatory damages) — not anywhere near the $5,000,000 (100 times the compensatory damages) that was awarded by the jury.

---

[39]*TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443 (1993).

[40]*Id.* at 460.

[41]*State Farm*, 538 U.S. at 425.

[42]*Id.* (quotation and citation omitted).

Flying B argues that we should sustain the $5 million amount under *Swinton*, because there we upheld a $1 million punitive damages for racial harassment where the compensatory damages award was $35,600.[43] That argument is not persuasive for several reasons. First, *Swinton* involves a much lower award, $1 million instead of $5 million, and less than one-third the ratio — punitive damages that were only 28, not 100, times the compensatory damages. Second, we decided *Swinton* before the Supreme Court decided *State Farm*, which limits *Swinton*. *State Farm* emphasizes and supplements the *BMW* limitation by holding that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."[44] In *Zhang v. American Gem Seafoods, Inc.*,[45] a post-*State Farm* § 1981 race discrimination case, we took note that "few awards exceeding a single digit ratio" will satisfy due process, although this is not a "bright-line rule," and upheld the award because it was only seven times the amount of compensatory damages.[46]

**[12]** We need not rely solely on the ratio, because the third *BMW* guidepost — which looks to the difference between the amount of punitive damages awarded and the civil penalties authorized or imposed in comparable cases[47] — provides us with another measure that restrains the permissible amount. Both pre-*State Farm* in *Swinton*, and post-*State Farm* in *Zhang*, we noted that the $300,000 statutory limitation on punitive damages in Title VII cases was an appropriate benchmark for reviewing § 1981 damage awards, even though the statute did not apply to § 1981 cases.[48]

---

[43]*Swinton*, 270 F.3d at 818.

[44]*State Farm*, 538 U.S. at 425.

[45]*Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020 (9th Cir. 2003).

[46]*Id.* at 1044 (quoting *State Farm*, 538 U.S. at 425).

[47]*BMW*, 517 U.S. at 574-75.

[48]*See Zhang*, 339 F.3d at 1045; *Swinton*, 270 F.3d at 820.

Flying B argues that the huge corporate assets of ARCO justify a higher award than might be justified for a defendant less able to pay it. A punitive damages award is supposed to sting so as to deter a defendant's reprehensible conduct, and juries have traditionally been permitted to consider a defendant's assets in determining an award that will carry the right degree of sting. But there are limits. "The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award," and "cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain significantly an award that purports to punish a defendant's conduct."**49**

**[13]** Thus what we are left with is a case of highly reprehensible conduct, though not threatening to life or limb, that caused economic harm to a corporation. The jury found $50,000 of actual harm, and, as this is not the "rare case" for which *State Farm* leaves room, the ratio approach suggests that punitive damages could not, consistent with due process, exceed $450,000. Comparing the award to the civil penalty authorized in Title VII for comparable harm suggests that Congress regards $300,000 as the highest appropriate amount in somewhat comparable cases. The conclusion we reach is that the district court must, to comply with *State Farm* (which came down after the district court had ruled) and *BMW*, reduce the amount of punitive damages to a figure somewhere between $300,000 and $450,000.

## CONCLUSION

**[14]** We affirm the jury verdict and the rulings of the district court on all issues, except for the amount of punitive damages, which we vacate. The award exceeds constitutional limits, so on de novo review, we are required to reduce it or to remand so that the district court may order a new trial, unless the plaintiff accepts a remittitur. The level of punitive damages is not a finding of "fact" that must be determined by

---

**49***State Farm*, 538 U.S. at 427-28 (quotation and citation omitted).

the jury; it may be determined de novo by the court.[50] Because the district court tried the case and has greater understanding of the facts than we do, we remand the case and leave the amount, within the $300,000 to $450,000 range, to the district court.

Each party shall bear its own costs on appeal.

**AFFIRMED in part, VACATED in part, and REMANDED.**

---

[50]*See Cooper Indus.*, 532 U.S. at 437.